IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2026 Session

## STATE OF TENNESSEE v. STEVE F. MABE, JR.

**Appeal from the Criminal Court for Smith County**
**No. 18-CR-157      Brody N. Kane, Judge**

_____

**No. M2024-01521-CCA-R3-CD**

_____

Defendant, Steve F. Mabe, Jr., appeals from his Smith County Criminal Court convictions for evading arrest, simple possession of a Schedule II controlled substance, possession of a Schedule II controlled substance with the intent to sell or deliver, and manufacture of a Schedule VI controlled substance, for which he received a total effective sentence of twenty-three years' incarceration. Defendant contends that the trial court erred in denying his Motion to Suppress all evidence against him and that the indictment should have been dismissed based upon a violation of his right to a speedy trial. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Daniel J. Turklay, Lebanon, Tennessee, for the appellant, Steve F. Mabe, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Jason Lawson, District Attorney General; and Jack Bare, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Procedural Background

This appeal arises from an incident that occurred in the early morning hours of October 5, 2017, at 32 Ward Hollow Road—a rural property located in the Brush Creek community of Smith County. Officers were investigating a report of an attempted burglary of an automobile when they were shot at by someone on the property. After a lengthy

search of the property, officers located and arrested Defendant, who was hiding in a marijuana patch.

In December 2018, the Smith County Grand Jury indicted Defendant on two counts of attempted first degree murder and one count each of felony reckless endangerment, possession of a firearm during the commission of a dangerous felony, unlawful possession of a weapon by a convicted felon, evading arrest, theft of property valued at $1,000 to $10,000, possession with intent to sell or deliver Oxycodone—a Schedule II controlled substance, possession with intent to sell or deliver methamphetamine—a Schedule II controlled substance, manufacture of between 20-99 plants of marijuana—a Schedule VI controlled substance, and possession of drug paraphernalia.[1]

The record reflects that the 15th Judicial District Public Defender's Office was appointed to represent Defendant but that, on December 14, 2018, the Public Defender's Office filed a motion to withdraw due to a conflict of interest. The trial court granted the motion and appointed a second attorney to represent Defendant. Defendant's trial was set for August 6-8, 2019, but in June 2019, the second attorney accepted a new job with the Sumner County District Public Defender's Office, necessitating the continuance of Defendant's scheduled trial. At that time, the trial court appointed a third attorney to represent Defendant. On August 30, 2019, Defendant filed a Motion for Speedy Trial, which was granted by the trial court after a hearing on September 4, 2019. Defendant's trial was then set for December 3-5, 2019. However, on December 6, 2019, the parties filed an agreed order setting Defendant's case for a motions hearing on March 16, 2020.

On March 2, 2020, Defendant filed numerous motions, including a Motion to Suppress all evidence seized from 32 Ward Hollow Road on the night of his arrest, arguing that it was fruit of an unreasonable search under the Fourth Amendment to the U.S. Constitution and Article 1, section 7 of the Tennessee Constitution. Following a hearing held on April 8, 2020, the trial court entered an order denying the Motion to Suppress.

On May 19, 2020, the parties filed an agreed order, setting Defendant's trial for August 11-13, 2020, with a motion hearing date of August 3, 2020. Then, on August 11, 2020, the parties filed another agreed order, resetting Defendant's trial for December 8-10, 2020.[2]

---

[1] It appears from the record that the counts charging theft of property valued at $1,000 to $10,000 and possession of drug paraphernalia were not submitted to the jury at trial.

[2] Based upon an exhibit in the record, it appears that Defendant's trial date of December 8-10, 2020, was likely reset due to a November 17, 2020 order from the Tennessee Supreme Court extending a "state of emergency" caused by the Covid-19 pandemic and reinstating the suspension of jury trials through January 31, 2021. This order was later extended through February 26, 2021.

On March 11, 2021, the trial court entered an order substituting the third attorney with a fourth attorney, who was retained by Defendant. On April 1, 2021, Defendant filed numerous pretrial motions, including a Motion to Dismiss for Lack of Speedy Trial. Following a hearing on April 8, 2021, the trial court entered an order denying the Motion to Dismiss for Lack of Speedy Trial. Defendant's trial began on April 20, 2021.

**Factual Background[3]**

Smith County Sheriff's Office (SCSO) Sergeant Jimmy Gregory was dispatched to 18 Ward Hollow Road at 12:55 a.m. on October 5, 2017, after the resident called dispatch and reported that "somebody was trying to break into a vehicle that was parked in [her] driveway." Sergeant Gregory, who was one of only two deputies on duty in Smith County at the time, responded to the rural area of Ward Hollow Road. Before speaking to the resident, Sergeant Gregory drove down the road to see if he could observe anyone walking away from the property; at that time, he noticed a red Jeep parked on the side of the road in front of a "little shed." The record contains a photograph of the shed, which was taken two weeks before trial. In the photograph, the shed appears to be little more than the frame of a weathered, unmaintained wooden structure. The structure has a "No Trespassing" sign on it, but it is overgrown by foliage; it has no roof, and it can be seen through.

Sergeant Gregory then went to 18 Ward Hollow Road and spoke to the resident, Kayla Stanley. Ms. Stanley told him that she had seen a man outside by her car petting her dog. She said that she hit a button on her key fob, setting off the car alarm, and that the man took off running toward the woods surrounding her property. Ms. Stanley said that she then heard a man and a woman arguing in the woods near her home before hearing what "sounded something like an ATV starting up in the wood line." She did not report that anything was missing from her car.

Sergeant Gregory began searching for the suspect in the direction of where Ms. Stanley reported hearing the argument. He, along with Deputy Nick Campbell, drove their patrol units to a mobile home located at 24 Ward Hollow Road; they "got out, checked around the residence, knocked on the door, [but] nobody answered." Nothing seemed out of place, so they began walking up the street toward 32 Ward Hollow Road. Sergeant Gregory noted that 32 Ward Hollow Road was an approximate address because there was

---

[3] This section summarizes "the proof adduced both at the suppression hearing and at trial," all of which this court may consider in reviewing the trial court's suppression ruling. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

not a residence on the property.[4]  From the road, all Sergeant Gregory could see was the shed on the side of the road where he had seen the red Jeep.  The red Jeep was still sitting there, about fifteen to twenty feet from the shed, but as they walked toward it, someone started the Jeep, turned its headlights off, pulled down into a wooded area on the property, and stopped behind a hill.  The red Jeep had a loud exhaust as if it was not properly mufflered, and he and Deputy Campbell believed that "somebody could have mistaken it for . . . [an] ATV."

After the red Jeep pulled behind the hill, the engine was turned off, and Sergeant Gregory and Deputy Campbell began walking from the road toward the Jeep.  The red Jeep was in an "open area" with "woods and stuff in front of it [and] behind it."  The record contains a photograph, taken from Ward Hollow Road, of the front of Ms. Hale's property where Sergeant Gregory and Deputy Campbell initially entered.  The photograph shows what appears to be an open field leading up to a tree line, where the property becomes more wooded.

Sergeant Gregory recalled that he could clearly see the red Jeep because there was a full moon that night, and he and Deputy Campbell, who were both in uniform, decided to go "down there to ask . . . if they had seen anything."  The officers crossed a cable that was about three feet off the ground and began walking down the hill toward the Jeep.  There was no driveway; however, there was a "pull off into the field," and the cable seemed to function as the "entrance" to the property.  There was "a lock" on the cable, along with black mesh fencing and a posted "No Trespassing" sign.

When they got about fifty to seventy-five yards onto the property, Sergeant Gregory pulled out his flashlight and turned it on.  At the "exact same time . . . there was a gunshot" fired at them.  They did not know who fired the shot.  Sergeant Gregory "hit the ground, pulled [his] weapon, grabbed Deputy Campbell and pulled him to the ground, and started giving out commands[.]"  Sergeant Gregory announced, "Smith County Sheriff's Office, come out with your hands up."  He then heard what sounded like people running through the woods.  Sergeant Gregory and Deputy Campbell reported "shots fired" over the radio and then retreated to their patrol cars and called for backup.

As they waited for backup, Sergeant Gregory and Deputy Campbell pulled their patrol cars near the shed and turned on flood lights to illuminate the field at the front of the property.  At some point, they heard the red Jeep start up again; two men, identified as "Mr. Davidson" and "Mr. Spurlock," then came up the hill and surrendered, but neither had a

_____

[4] When asked how he came up with the number 32, Sergeant Gregory explained that the "house across the road was 33 [Ward Hollow Road]."

- 4 -

firearm. The two men were taken into custody and later questioned at the sheriff's department.[5]

When backup arrived, officers conducted a protective sweep of the property. The property "was open for the first probably fifty to seventy-five yards" and then it became "more wooded." As officers went through the woods, they began searching about twenty vehicles—some operable, some not—scattered across the property in an attempt to locate the person who shot at Sergeant Gregory and Deputy Campbell. The vehicles were not visible from the road and were parked throughout the woods. The officers also located a twenty-five to twenty-eight foot long "camper" in the woods with a light on inside it. The camper was powered by "[g]enerators and propane[,]" and there was a utility building behind it. The officers knocked and announced themselves several times but got no response. Officers then opened the door and threw in a "robot" to look around. They later entered the camper and found Martha Hale (also known as Martha Conger) hiding under a bed with two rifles. Initially, Ms. Hale cooperated by giving officers a description of Defendant, who was her boyfriend. However, as Ms. Hale was being led out of the woods, she yelled, "Run, baby, run!"

As Sergeant Gregory and other officers began going down a path cut through the woods behind the camper, he "kept hearing movement in the woods and stuff off to [his] right." As they proceeded further, Sergeant Gregory could smell a strong odor of marijuana, and a couple hundred yards from the camper, he discovered they were standing in a patch of marijuana. Sergeant Gregory estimated the patch had more than 20 but less than 99 marijuana plants. Sergeant Gregory saw Defendant at the edge of the patch "bent over tying a bail of marijuana." Defendant was wearing a camouflage "ghillie suit." He ran when spotted by the officers but Sergeant Gregory quickly captured him, thereby ending the hours-long manhunt. As Sergeant Gregory led Defendant out of the woods, Sergeant Gregory felt something hit his foot. Thinking he had dropped his radio, Sergeant Gregory turned on his flashlight and found that a loaded 9mm handgun had hit his foot. The gun did not belong to any of the officers.

Once Sergeant Gregory got Defendant back to the road, Defendant was searched, and officers found a backpack that contained 4.5 Oxycodone pills and approximately 25 grams of methamphetamine. Following Defendant's arrest, SCSO Detective Sergeant Dusty Hailey, who had responded to the scene to assist in the manhunt, collected a spent .380 caliber shell casing near the red Jeep. Later testing by the Tennessee Bureau of Investigation showed that the shell casing had been "cycled" through the 9mm handgun; however, damage to the shell casing made it unclear whether the gun had fired it.

---

[5] It does not appear from the record that Mr. Davidson and Mr. Spurlock were charged with any offenses in relation to the incident.

Evidence established that Ms. Hale was the sole owner of the 10-acre "unimproved" property referred to as 32 Ward Hollow Road. Ms. Hale claimed that, on October 5, 2017, she was living in the camper on the property with Defendant, who was her boyfriend, and that Defendant sometimes worked on the vehicles parked throughout the property. She described the property as having a fence on the right and back side of it and a "rock wall fence" on the left side.

Defendant testified that he was in a "relationship" with Ms. Hale and that he spent a significant amount of time on the property at 32 Ward Hollow Road, cleaning and bushhogging it. Defendant explained that he was a mechanic and owned his own garage in Dekalb County. He acknowledged that he was on the property on October 5, 2017; he testified, "I reside in Dekalb County. So, I actually had come from where I live to turkey hunt that day in Brush Creek. So, after I got done turkey hunting, I stopped by the property where Ms. Hale was at."[6] Later that evening, several friends arrived at the property, including Mr. Davidson and Mr. Spurlock. According to Defendant, he and Mr. Davidson were working on replacing a transmission on a truck on the property when they discovered they were missing a tool. He explained that Mr. Davidson had left the tool in his red Jeep at the front of the property. Mr. Davidson went to retrieve the tool but returned to Defendant about thirty minutes later holding a gun. Mr. Davidson told Defendant that he had fired a gunshot in the air after hearing people in the woods. Mr. Davidson said that, as the people ran away, they were "hollering 'Smith County Sheriff's Department; Smith County Sheriff's Department.'"

Defendant admitted that he later fled into the woods after hearing officers yelling, "Come out with your hands up," when Mr. Davidson and Mr. Spurlock were taken into custody. He further admitted that he hid in the woods as the officers started their protective sweep of the property. He denied having a gun or drugs on him when he was arrested, and he denied shooting at Sergeant Gregory and Deputy Campbell. He also denied knowing about the marijuana patch on the property, despite his claim that he regularly cleaned and bushhogged the property.

Following deliberations, the jury found Defendant guilty of evading arrest; simple possession of a Schedule II controlled substance (as a lesser-included offense of possession with intent to sell or deliver Oxycodone, a Schedule II controlled substance); possession with intent to sell or deliver methamphetamine, a Schedule II controlled substance; and manufacture of between 20-99 plants of marijuana—a Schedule VI controlled substance.[7]

---

[6] On cross-examination, when asked if he had been at home on the evening of the shooting, Defendant reiterated, "Well, no. Actually I wasn't at home. My home is in Dekalb County." He agreed, however, that he had been spending time with Ms. Hale and others at her property on Ward Hollow Road.

[7] The jury also convicted Defendant of misdemeanor reckless endangerment, as a lesser-included offense of felony reckless endangerment, but the trial court set aside that conviction.

- 6 -

The jury acquitted Defendant on the remaining counts. The trial court subsequently sentenced Defendant, as a Range II offender, to a total effective sentence of twenty-three years in confinement.

Defendant filed a timely Motion for New Trial and Amended Motion for New Trial, which the trial court denied after a hearing. This timely appeal follows.

## Analysis

### A. Motion to Suppress

During a hearing on Defendant's Motion to Suppress, defense counsel stated that Defendant was only challenging the initial warrantless entry onto the property at 32 Ward Hollow Road. He conceded that, when the gun was fired at the officers, this created exigent circumstances, asserting that "when a gunshot goes off, sure . . . there's hot pursuit, exigent circumstances of course." Nonetheless, defense counsel argued that all evidence should be suppressed as fruit of the initial unlawful entry onto the property.

The State argued that Defendant lacked standing to challenge the search of the property because, even as a social guest of Ms. Hale, he had no privacy interest in the "open fields" on her property. Additionally, the State argued that Sergeant Gregory and Deputy Campbell were "not going onto the property to snoop around" but were instead reasonably investigating a "possible burglary." The State further asserted that there were "exigent circumstances" and a "hot pursuit" after the shot was fired at the officers.

At the conclusion of the hearing, the trial court denied Defendant's Motion to Suppress. The court found that Sergeant Gregory and Deputy Campbell had "reasonable suspicion" to enter the "open land" of 32 Ward Hollow Road to further investigate the "attempted break-in of [Ms. Stanley's] vehicle." The court identified several suspicious circumstances: the time of day (12:55 a.m.); the suspect's petting of the dog and running into the woods after Ms. Stanley set off her car alarm; the arguing in the woods and what sounded like an ATV starting up in the direction of Ms. Hale's property; the movement of the red Jeep as officers approached it; and the similar engine sound of the Jeep to an ATV. The court further found that, once someone fired a gun at the officers, exigent circumstances justified further warrantless searches on the property.

On appeal, Defendant contends that the trial court erred in denying his Motion to Suppress. Defendant asserts that officers illegally searched his home and the curtilage of his home (or his "possessions" under the Tennessee Constitution) without a warrant or a valid exception to the warrant requirement and that, as such, the trial court should have suppressed the evidence against him. The State responds that the trial court properly denied

the Motion to Suppress after concluding that officers reasonably entered the "open land" of the property to investigate "an attempted break-in of [Ms. Stanley's] vehicle." The State argues that Defendant had no privacy interest in the open fields on Ms. Hale's property and, therefore, lacked standing to challenge the officers' initial warrantless entry onto the property.

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. *Id*. The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id*. (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *Walton*, 41 S.W.3d at 81; *Henning*, 975 S.W.2d at 297-99.

## *1. Initial Entry onto the Property*

The United States and Tennessee constitutions protect citizens from unreasonable searches and seizures. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The protections of the Fourth Amendment are implicated when the government either trespasses on a constitutionally protected area or invades an individual's reasonable expectation of privacy. *See United States v. Jones*, 565 U.S. 400, 407-09 (2012). The "rights assured by the Fourth Amendment are personal rights, and . . . they may be enforced by the exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010) (quoting *Simmons v. United States*, 390 U.S. 377, 389 (1968)) (alteration in *Talley*).

Therefore, "[i]n order to challenge the reasonableness of a search or seizure, the defendant must have a legitimate expectation of privacy in the place or thing to be searched." *State v. Cothran*, 115 S.W.3d 513, 520-21 (Tenn. Crim. App. 2003); *see Katz v. United States*, 389 U.S. 347, 357 (1967); *see also State v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987) (stating that Tennessee affords no greater protection than *Katz*'s principle of what a person knowingly exposes to the public).

An individual's reasonable expectation of privacy can extend to his home and its curtilage; however, no expectation of privacy legitimately attaches to "open fields." *See United States v. Dunn*, 480 U.S. 294, 300 (1987); *Oliver v. United States*, 466 U.S. 170, 180 (1984); *see also State v. Jennette*, 706 S.W.2d 614, 619 (Tenn. 1986). The curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life[.]" *Oliver*, 466 U.S. at 180 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)) (internal quotation marks omitted). Whether an area falls within the curtilage is a fact-intensive inquiry requiring consideration of four factors: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301; *see also State v. Houston-Polk*, No. M2023-01117-CCA-R3-CD, 2024 WL 4492236, at *5 (Tenn. Crim. App. Oct. 15, 2024), *perm. app. denied* (Tenn. Mar. 12, 2025).

The Fourth Amendment does not protect "'open fields'—even if those fields are privately owned—because such fields are not enumerated in the Amendment's text." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citing *Hester v. United States*, 265 U.S. 57 (1924)); *see also Jennette*, 706 S.W.2d at 619. "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Oliver*, 466 U.S. at 178. This rule is true even when a person "plant[s] . . . mari[j]uana upon secluded land and erect[s] fences and 'No Trespassing' signs around the property." *Id*. at 182. "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id*. at 182-83.

The evidence from the suppression hearing and trial established that, although Defendant was in a "relationship" with Ms. Hale and spent time on the property at 32 Ward Hollow Road, cleaning and bushhogging it, Defendant did not live there. Defendant testified repeatedly that he resided in Dekalb County and that, on October 5, 2017, he had traveled from his home to the Brush Creek area to go turkey hunting and then stopped by the property on Ward Hollow Road to visit Ms. Hale. Under these circumstances, we agree with the State that Defendant was an overnight social guest; as such, Defendant had a

- 9 -

privacy interest in Ms. Hale's home and its curtilage. *See Minnesota v. Olson*, 495 U.S. 91, 99 (1990) ("[An overnight guest] seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside.").

The State maintains, however, that when the officers stepped over the metal cable at the front of the "unimproved" 10-acre property, they entered an open field where Defendant did not have a privacy interest. We agree. Other than the "little shed" near the road, the front portion of the property was unoccupied and undeveloped. There was no driveway but merely a "pull off into the field," and from the road, there did not appear to be a home on the property. The property was "open for the first probably fifty to seventy-five yards" before becoming "more wooded," and the area could be easily viewed from the street. Sergeant Gregory testified that he and Deputy Campbell went only about fifty to seventy-five yards onto the property before he turned on his flashlight, and someone on the property shot at them. Although there was a metal cable with a lock and black mesh stretched across it that functioned as the entrance to the property, this area at the front of the 10-acre property lacked all characteristics of curtilage, *i.e.*, proximity to the home, evidence of use for domestic life, or signs that the owner had taken steps to protect the property from public observation. *See Dunn*, 480 U.S. at 301. Because Defendant did not have a privacy interest in the open fields of Ms. Hale's property, he lacked standing to challenge the officers' initial warrantless entry.

Defendant contends alternatively that, even if the area at the front of the property where the officers entered was not part of the curtilage, it was protected as a "possession" under Article I, section 7 of the Tennessee Constitution. In *Welch v. State*, 289 S.W. 510 (Tenn. 1926), our supreme court stated that the word "possessions" was placed in Article I, section 7 to limit searches of real and personal property, "actually possessed or occupied." The court noted that "actual possession" is usually evidenced by occupation, substantial enclosure, cultivation, or appropriate use. *Id*. at 511. The court held, however, that the word "possessions" does not include "wild or waste lands, or other lands that were unoccupied." *Id*.; *see also State v. Doelman*, 620 S.W.2d 96, 99 (Tenn. Crim. App. 1981); *Rainwaters v. Tenn. Wildlife Res. Agency*, No. W2022-00514-COA-R3-CV, 2024 WL 2078231, at *12-14 (Tenn. Ct. App. May 9, 2024), *no perm. app. filed*. If the land is not "used in the daily operation of the premises, then the constitutional provision against unreasonable searches and seizures does not apply." *Chico v. State*, 394 S.W.2d 648, 651 (Tenn. 1965); *see also Welch*, 289 S.W. at 511 (noting the land was "in daily use in connection with and as a necessary part of his farming operations").

Here, although the front portion of Ms. Hale's 10-acre property where Sergeant Gregory and Deputy Campbell initially entered was enclosed by a metal cable, the evidence did not establish that this area was "used in the daily operation of [the] premises." *Chico*,

- 10 -

394 S.W.2d at 651.  Unlike in *Rainwaters*, the evidence did not show that Ms. Hale used the front of her property for "farming, fishing, camping, and hunting."  *Rainwaters*, 2024 WL 2078231, at *15.  Moreover, there was no evidence that Ms. Hale used the front portion of her property "daily" in connection with "farming operations[,]" as in *Welch,* 289 S.W. at 511.  The photograph of the front of Ms. Hale's property where Sergeant Gregory and Deputy Campbell entered shows that, aside from the presence of the shed by the road, the outer fringes of her 10-acre property was an open field or "wild or waste lands."  *Id.* Accordingly, we conclude that the open field where the officers initially entered was not protected as a "possession" under Article I, section 7 of the Tennessee Constitution. Because Defendant had no privacy interest in this front portion of Ms. Hale's property, he lacked standing under Article I, section 7, to challenge the officers' initial warrantless entry.  He is not entitled to relief.

*2. Protective Sweep of the Property and Search of the Camper*

Defendant also challenges the trial court's finding that the gunshot created exigent circumstances, justifying the officers' protective sweep of the property and search of the camper.  The State asserts, however, that Defendant has waived our consideration of this claim.

A motion to suppress is required to state the grounds upon which it is predicated with particularity and "must be sufficiently definite, specific, detailed and non-conjectural, to enable the court to conclude a substantial claim . . . [is] presented."  *State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023) (quoting *State v. Burton*, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988)); *see also* Tenn. R. Crim. P. 47(c).  An appellant cannot raise an issue for the first time on appeal or change his arguments on appeal.  *See Hardison*, 680 S.W.3d at 309; *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *see also* Tenn. R. App. P. 36(a).  "In other words, 'a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason' on appeal."  *Hardison*, 680 S.W.3d at 309 (quoting *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988)).

As noted by the State, Defendant limited his suppression motion to challenging the initial warrantless entry onto Ms. Hale's property, and defense counsel affirmatively conceded before the trial court that the gunshot created exigent circumstances, justifying the protective sweep of the property and search of the camper.  Thus, we agree that Defendant has waived our consideration of this issue.  *See id.*  Moreover, Defendant did not request plain error review, and we decline to conduct such a review.  Defendant is not entitled to relief on this issue.

### *B. Motion to Dismiss for Lack of Speedy Trial*

Defendant asserts that his convictions should be reversed because his right to a speedy trial was violated by the three-and-one-half-year delay between the date of his arrest and the start of his trial. He contends that consideration of the four factors from *Barker v. Wingo*, 407 U.S. 514, 530, (1972), supports a finding of a speedy trial violation.[8] The State responds that Defendant has waived this claim by failing to include the relevant motion hearing transcript in the appellate record.

As the appellant, Defendant bears the burden to prepare "a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993) (citing *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)); *see* Tenn. R. App. P. 24(b) (stating that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)).

Here, the record reflects that Defendant filed numerous motions, including a Motion to Dismiss for Lack of Speedy Trial, on April 1, 2021. The trial court disposed of these motions in a written order filed April 13, 2021. Regarding the Motion to Dismiss for Lack of Speedy Trial, the order simply states that the motion was "dismissed." The order references a motion hearing held on April 8, 2021, and the record on appeal contains three exhibits from that hearing. As noted by the State, however, the record does not contain a transcript of the April 8, 2021 hearing, and the trial court's order does not contain factual findings and conclusions of law regarding the four *Barker* factors. Moreover, in response to the State's waiver argument, Defendant did not file a reply brief or otherwise seek to supplement the record with the hearing transcript.

We agree with the State that, without the transcript of the April 8, 2021 hearing, the record is inadequate for our review. Although the State does not dispute the length of the delay and Defendant's demand for a speedy trial, there is a lack of proof and/or factual

---

[8] "In determining whether a criminal defendant was denied a speedy trial, the court examines four factors: (1) the length of the delay; (2) the reason for the delay; (3) whether there was a demand for a speedy trial; and (4) the presence and extent of prejudice to the defendant." *State v. Moon*, 644 S.W.3d 72, 79 (Tenn. 2022) (citing *Barker*, 407 U.S. at 530).

findings regarding the reasons for the delay and the existence of prejudice under *Barker*. Due to the absence of this transcript, we must presume that the trial court's findings are supported by the record. Thus, Defendant is not entitled to relief.

## IV. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.


s/*Robert L. Holloway, Jr.*
ROBERT L. HOLLOWAY, JR., JUDGE